1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DEBORAH A. BONENFANT,

11          Plaintiff,                              No. CIV S-10-0361 KJM-KJN

12      vs.

13   STANDARD INSURANCE
     COMPANY, a corporation; and DOES
14   1 through 30, inclusive,

15          Defendant.                              ORDER

16   _____/

17          This matter comes before the court on defendant Standard Insurance Company's

18   motion for summary judgment on plaintiff Deborah Bonenfant's claim for breach of the duty of

19   good faith and fair dealing.  (ECF 23.)  The court heard oral argument on the motion on July 13,

20   2011; Linda Lawson appeared for defendant and Robert Scott appeared for plaintiff.  For the

21   following reasons, defendant's motion for partial summary judgment is hereby GRANTED.

22   I.  PROCEDURAL HISTORY AND UNDISPUTED FACTS

23          Plaintiff filed her complaint in Placer County Superior Court on December 9,

24   2009 alleging two causes of action: breach of contract and breach of the duty of good faith and

25   fair dealing.  (ECF 2-1.)  Defendant removed the action to this court on February 11, 2010.

26   (ECF 2.)  Defendant filed the present motion for summary judgment on May 6, 2011.  (ECF 23.)

                                                1

Plaintiff filed her opposition on May 25, 2011 (ECF 25) and an amended opposition on June 29, 2011.  (ECF 27.)[1]  Defendant filed its reply on June 30, 2011.  (ECF 28.)

Defendant issued plaintiff an individual disability income insurance, policy number C7445470 ("the policy"), which became effective on April 10, 1997.  (Def.'s Statement of Undisputed Facts ¶ 1, ECF 23-2 (hereinafter, "ECF 23-2"); Pl.'s Responsive Statement of Undisputed Facts ¶ 1, ECF 25-1 (hereinafter, "ECF 25-1").)  The policy defines "Total Disability/Totally Disabled" as the following:

> Because of Your Injury or Sickness:
> 1.    You are unable to perform the substantial and material duties of Your Regular Occupation; and
> 2.    You are not engaged in any other gainful occupation; and
> 3.    You are under the regular care of a Physician appropriate for Your Injury or Sickness.

(Not. of Removal, Compl. Ex. 1, ECF 2-1 at 24.)  The policy defines "Regular Occupation" as "your occupation at the time Disability begins" "[u]ntil You have received 60 monthly payments for a Continuous Disability" after which time it is "any occupation for which You are reasonably fitted by education, training and experience."  (*Id.*)  Plaintiff notified defendant that she was submitting a claim for benefits on April 11, 2007.  (ECF 23-2 ¶ 5; ECF 25-1 ¶ 5.)

On her Insured's Statement, plaintiff listed her occupation title as "manager" and listed her job duties as "at computer typing notes from meetings, doing reports"; "business meetings"; "telephone conversations"; and "administrative staff, coach, mentor."  (Nickelson Decl., Ex. 3, ECF 23-14.)  Plaintiff indicated she became unable to work on February 26, 2007,

---

[1] Plaintiff's briefs ignore the standing orders of the previously-assigned district judge (ECF 6) and the undersigned, placing a limit of twenty (20) pages on oppositions.  Counsel is cautioned to strictly comply with the Federal Rules of Civil Procedure, Local Rules and the court's standing order in the future.  Counsel also is cautioned that failure to obtain the court's permission prior to filing documents in excess of court-mandated page limits is sanctionable in accordance with Local Rule 110 and can result in an order striking documents with leave to refile compliant documents or in the court's ignoring all excess pages.  In this instance, given that more than nine pages of the memorandum are a copied and pasted segment of David Peterson's Declaration, which is in the record (ECF 25-3 at 11-25), the court disregards these pages of the memorandum.  (ECF 27-1 at 15-25.)

that her illness was "ruptured cervical disks," and that her symptoms include "neck pain, severe

headaches, tingling & numbness in arms & hands." (*Id.*)  She listed her attending physicians as

Dr. Ernest Agresti, Dr. Pasquale Montesanto, and Dr. Elvert Nelson.  (*Id.*)  Plaintiff also

submitted an Attending Physician's Statement ("APS") from Dr. Agresti dated April 20, 2007,

which identified plaintiff's primary condition as cervical disc herniation with a secondary

diagnosis of cervicalgia and other diagnoses of hypothyroid, hypertension, hyperlipidemia,

gastro esophageal reflux spasm, pain, numbness, tingling, weakness and osteoarthritis.

(Nickelson Decl., Ex. 4, ECF 23-15.)  Dr. Agresti further indicated that plaintiff's functional

capacity was severely limited and that she had the following physical limitations, which he

anticipated would impair plaintiff until September 10, 2007: standing/sitting/walking;

bending/stooping; lifting/carrying; and use of hands.  (*Id.*)

On May 2, 2007, one of defendant's employees spoke with plaintiff, at which

time plaintiff indicated that she sat most of the work day.  (Nickelson Decl., Ex. 5, ECF 23-16.)

Also on May 2, 2007, defendant requested records from Dr. Agresti, Dr. Montesanto and Dr.

Nelson (Nickelson Decl., Ex. 6, ECF 23-17)[2] and referred plaintiff's claim to a vocational

consultant, Don Earwood, to review plaintiff's "regular occupation."  (ECF 23-2 ¶ 19; ECF 25-1

¶ 19.)[3]  On May 8, 2007, Earwood reviewed plaintiff's Insured's Statement, resume and notes of

the May 2, 2007 phone call.  (Nickelson Decl., Ex. 7, Earwood Report Mem., ECF 23-18.)

---

[2] On August 16, 2007, Dr. Agresti submitted another APS to defendant.  (Nickelson Decl. Ex. 12, ECF 23-23.)  On October 3, 2007, defendant also received medical records from Dr. Orisek.  (ECF 23-2 ¶ 33; ECF 25-1 ¶ 33.)  On January 30, 2008, defendant received another APS from Dr. Agresti.  (ECF 23-2 ¶ 36; ECF 25-1 ¶ 36.)  On July 17, 2008, defendant requested medical records from Drs. Agresti, Hankins and Schaefer.  (ECF 23-2 ¶ 49; ECF 25-1 ¶ 49.) Defendant requested updated medical records again on January 28, 2009.  (ECF 23-2 ¶ 62; ECF 25-1 ¶ 62.)  Defendant received another APS from Dr. Agresti on July 17, 2009.  (ECF 23-2 ¶ 84; ECF 25-1 ¶ 84.)

[3] Plaintiff disputes "that [Earwood] reviewed Bonenfant's regular occupation properly or at all" (ECF 25-1 ¶ 19) but cites only to the Peterson declaration, in which Peterson states that Earwood's conclusion regarding the classification of plaintiff's job "was unreasonable." (Peterson Decl. at 11, ECF 25-3.)  This declaration is inadmissible, as will be discussed below, and plaintiff provides no other evidence for her position in this regard.

Relying on the U.S. Department of Labor's Dictionary of Occupational Titles, Earwood determined that the "Manager, Office" occupation best described the duties of plaintiff's regular occupation.  (*Id.*)  This occupation is described as "sedentary strength, [requiring] the exertion of force 'to 10 lbs. occasionally, or a negligible amount of force frequently to lift, carry, push, pull, or move objects.'"  (*Id.*)  Defendant further submitted plaintiff's medical records to Dr. David Waldram, a physician consultant board certified in orthopedic surgery, for review.  (ECF 23-2 ¶ 24; ECF 25-1 ¶ 24.)  Dr. Waldram found support for limitations and restrictions being placed on plaintiff from February 23, 2007 to August 2007; specifically, that plaintiff should avoid "prolonged sitting, moving neck & can't do repetitive bending or lifting."  (Nickelson Decl., Ex. 9, ECF 23-20.)

Defendant approved plaintiff's application for disability benefits on June 12, 2007.  (Nickelson Decl., Ex. 10, ECF 23-21.)  Defendant continued to receive periodic updates from plaintiff and her doctors.  *See, e.g.*, note 2 *supra*.  On July 15, 2008, plaintiff left defendant a voice message stating she had not been receiving State Disability as of February 2008 and that she applied for social security disability and was denied, which decision she appealed, which appeal was denied.  (Nickelson Decl., Ex. 20, ECF 23-31.)  On November 5, 2008, Dr. Waldram reviewed plaintiff's medical records and indicated that plaintiff "could have returned to sedentary work with no overhead use of either extremity" as of August 2007 through to the date of an April 11, 2008 surgery, and that she could have returned to work after that surgery on June 26, 2008.  (Nickelson Decl., Ex. 24, ECF 23-35.)  On April 28, 2009, Dr. Waldram again reviewed plaintiff's medical records and indicated that she could have returned to work after her December 31, 2008 surgery, with limitations.  (Nickelson Decl., Ex. 30, ECF 23-41.)  However, on May 5, 2009, Dr. Waldram indicated that based on records from April 2009 "it was still reasonable at this time that [plaintiff] has not gone back to work" and told defendant to obtain her most recent medical records.  (Nickelson Decl., Ex. 31, ECF 23-42.)  On May 5, 2009, defendant contacted Dr. Schaefer and asked if plaintiff could go back to work; on May 6, 2009,

1   Dr. Schaefer sent defendant a letter stating that plaintiff could return to work as long as she did

2   not perform overhead work or lift more than ten pounds.  (Nickelson Decl., Ex. 32, ECF 23-43.)

3   On May 26, 2009, Dr. Waldram stated he agreed with Dr. Schaefer that plaintiff could return to

4   work restricted to no overhead work or lifting over ten pounds.  (Nickelson Decl., Ex. 33, ECF

5   23-44.)  On June 4, 2009, defendant referred plaintiff's file to a vocational consultant, Jan

6   Cottrell, for clarification as to the requirements of plaintiff's regular occupation; Dr. Cottrell

7   concluded that overhead reaching is not required for plaintiff's occupation, nor is exerting over

8   ten pounds of force.  (ECF 23-2 ¶ 79; ECF 25-1 ¶ 79; Nickelson Decl., Ex. 34, ECF 23-45.)  On

9   September 30, 2009, defendant notified plaintiff that it had determined she no longer met the

10  policy's definition of disability.  (Nickelson Decl., Ex. 37, ECF 23-48.)  This notification letter

11  indicates that Dr. Waldram reviewed plaintiff's complete medical file, including updates

12  received from her various physicians, and concluded that she was able to return to work in her

13  sedentary position.  (*Id*. at 6-7.)

14  II.  <u>OBJECTIONS TO EVIDENCE</u>[4]

15          Defendant objects to the Peterson declaration "because his opinion testimony

16  constitutes improper legal conclusions which usurp the function of the Court and jury" and on

17  the grounds of lack of foundation, speculation, improper opinion testimony, improper legal

18  conclusion, the best evidence rule, hearsay, relevance and mischaracterizing the evidence.

19  (Def.'s Obj. Evid. at 4-41, ECF 28-2.)  The court sustains defendant's objection for the following

20  reasons and hereby strikes the Peterson declaration in its entirety.  As a preliminary matter, this

21  declaration is inadmissible as it is not signed.  Furthermore, the court finds an utter lack of

22  foundation explaining how Peterson, plaintiff's proffered "expert," came by any of his

23  underlying facts, such as his contention that Earwood was never provided with plaintiff's

24

25          [4] The court generally addresses only those objections to evidence upon which it relies.  In
    this section, however, the court addresses those objections to evidence upon which plaintiff
26  heavily relies, as it has determined not to consider this evidence.

1   resume. (Peterson Decl. at 11).  *See Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir.

2   2001) ("This circuit has held that self-serving affidavits are cognizable to establish a genuine

3   issue of material fact so long as they state facts based on personal knowledge and are not too

4   conclusory.").  "An affidavit or declaration used to . . . oppose a motion must be made on

5   personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

6   or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  The

7   Peterson declaration does not meet any of these criteria.  In addition, Peterson's declaration does

8   not serve to "assist the trier of fact to understand the evidence or to determine a fact in issue,"

9   FED. R. EVID. 702, but consists of purely conclusory statements.  *Hernandez v. City of Napa*,

10  2011 U.S. Dist. LEXIS 28757, at *30 (N.D. Cal. Mar. 21, 2011) (quoting *Soremekun v. Thrifty*

11  *Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007)) ("'Conclusory, speculative testimony in

12  affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary

13  judgment.'").  Moreover, Peterson's statements consist of opinions on ultimate issues of law,

14  which are inadmissible.  *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002).

15  Furthermore, much of Peterson's declaration consists of inadmissible hearsay, offered to prove

16  the truth of the matter asserted.  FED. R. EVID. 801.  In addition, portions of the declaration are

17  directly contradicted by plaintiff's statement of undisputed facts and other facts in the record.

18  (*E.g., compare* ECF 25-1 ¶ 20 *with* Peterson Decl. at 11:23.)

19          Defendant also objects to Exhibit I to the Scott Declaration, contending that it has

20  not been properly authenticated.  (Def.'s Obj. to Evid. at 2-3.)  The court sustains this objection

21  and hereby strikes Exhibit I in its entirety, as well as any references to Exhibit I in plaintiff's

22  opposition.  Moreover, counsel for plaintiff admitted both in his declaration and at the motion

23  hearing that this exhibit was not filed and served electronically.  (Scott Decl. ¶ 10, ECF 25-2.)

24  Local Rule 133(a) expressly states: "Unless excused by the Court or by the electronic filing

25  procedures set forth in these Rules, attorneys shall file all documents electronically pursuant to

26  those Rules."  Local Rule 260(b) states: "The opposing party shall be responsible for the filing

1    of all evidentiary documents cited in the opposing papers."  Moreover, Federal Rule of Civil

2    Procedure 56(c)(1)(A) provides that parties may support their assertions by "citing to particular

3    parts of materials in the record . . . "; however,  Exhibit I is not "in the record" and plaintiff's

4    reliance on the unfiled, unserved Exhibit I is in contravention of the Local Rules, Federal Rule of

5    Civil Procedure 56, and established common law.  *See, e.g., Nicholson v. Hyanis Air Serv.*, 580

6    F.3d 1116, 1127 (9th Cir. 2009) (documents that are not filed do not become part of the record).

7    III.  ANALYSIS

8         A.  Standard

9              A court will grant summary judgment "if . . . there is no genuine dispute as to any

10   material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

11   The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

12   resolved only by a finder of fact because they may reasonably be resolved in favor of either

13   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[5]

14              The moving party bears the initial burden of showing the district court "that there

15   is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477

16   U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish that

17   there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

18   475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular parts

19   of materials in the record . . .; or show [] that the materials cited do not establish the absence or

20   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

21   support the fact."  FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the

22   nonmoving party] must do more than simply show that there is some metaphysical doubt as to

23   the material facts").  Moreover, "the requirement is that there be no *genuine* issue of *material*

24   _____

25        [5] Rule 56 was amended, effective December 1, 2010.  However,  it is appropriate to rely
     on cases decided before the amendment took effect, as "[t]he standard for granting summary
     judgment remains unchanged."  FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010
26   amendments.

1  fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing

2  law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 247-48

3  (emphasis in original).

4          In deciding a motion for summary judgment, the court draws all inferences and

5  views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at

6  587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).   "Where the record taken as a

7  whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

8  issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities

9  Service Co.*, 391 U.S. 253, 289 (1968)).

10         B.  Application

11         Defendant contends it is entitled to summary judgment on plaintiff's cause of

12 action for breach of the covenant of good faith and fair dealing due to California's "genuine

13 dispute doctrine."  (Def.'s Mot. at 13.)  Defendant contends that its "investigation and its denial

14 of additional disability benefits were indisputably reasonable, in good faith, and due to a genuine

15 dispute as to Bonenfant's eligibility for such benefits."  (*Id*. at 14.)  It further maintains that "the

16 undisputed evidence in this case establishes, at a minimum, a genuine dispute regarding

17 Bonenfant's eligibility for further benefits."  (*Id*. at 17.)  Plaintiff asserts that defendant cannot

18 rely on the genuine dispute doctrine because its "conduct was below the standard of care when it

19 acted unreasonably in investigating plaintiffs' [sic] claim."  (Pl.'s Opp'n at 7.)  Plaintiff contends

20 that defendant did not "thoroughly investigate Plaintiff's claim," that its investigation of

21 plaintiff's claim was "below industry standards," it "misapplied, misstated, misrepresented and

22 at all times failed to even advise Plaintiff of the correct California definition of 'total disability'

23 in its correspondence," and it "put its own financial interests above Plaintiff's."  (*Id*. at 9, 10, 12

24 & 13.)

25         The covenant of good faith and fair dealing "obligates the insurer: (1) to make a

26 thorough and prompt investigation of the insured's claim for benefits; and (2) not to

unreasonably delay or withhold payment of benefits." *Casey v. Metropolitan Life Ins. Co.*, 688 F. Supp. 2d 1086, 1098 (E.D. Cal. 2010) (citing *Silberg v. California Life Ins. Co.*, 11 Cal. 3d 452, 461-62 (1974)).  The covenant is breached where the insurer acts unreasonably or without proper cause, *id.*; "[t]he mere denial of benefits . . . does not demonstrate bad faith." *Hanson v. The Prudential Ins. Co. of Am.*, 783 F.2d 762, 766 (9th Cir. 1985).  Unreasonable in this context means "without any reasonable basis for its position." *Casey*, 688 F. Supp. 2d at 1098. Accordingly, "bad faith liability does not exist for a legitimate dispute of an insurer's liability under the policy." *Id.*  "A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds," and its existence can be decided as a matter of law "[p]rovided there is no dispute as to the underlying facts."  *Id.* at 1098-99; *see Bosetti v. United States Life Insurance Co.*, 175 Cal. App. 4th 1208, 1237 (2009) ("The 'genuine dispute' . . . doctrine . . . enables an insurer to obtain summary adjudication of a bad faith cause of action by establishing that its denial of coverage, even if ultimately erroneous and a breach of contract, was due to a genuine dispute with its insured.").

"'An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions.'" *Gentry v. State Farm Mut. Auto. Ins. Co.*, 726 F. Supp. 2d 1160, 1169 (E.D. Cal. 2010) (quoting *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 723 (2007)).  Among other contentions, most notably regarding defendant's alleged breaching of the "industry standard," plaintiff presents the following as the total circumstances: "1) Standard's consulting physician, Dr. Waldram, merely reviewed Plaintiff's medical records; 2) Standard's adjuster, Ethel Sly, denied Plaintiff's claim for disability benefits without actually knowing either the definition of Plaintiff's conditions or definition of the medication Plaintiff was taking to treat the conditions;[6] 3) Standard failed to conduct an independent medical review of

---

[6] Plaintiff provides no evidence to support this second contention, nor is this conclusory, self-serving statement an accurate description of defendant's decision to deny plaintiff's claim. The court will not consider this contention.

9

1    Plaintiff's medical records; 4) Standard failed to conduct an independent medical exam to

2    determine if Plaintiff was disabled; 5) Standard failed to apply the correct standard for total

3    disability in California; and 6) Standard rejected Plaintiff's claim for disability benefits based on

4    Plaintiff's problems with her shoulders when the main cause of her disability was the debilitating

5    pain in her neck due to three-levels of cervical herniation."[7]  (Pl.'s Opp'n at 26.)

6            Plaintiff's contention that it was unreasonable for Dr. Waldram to review

7    plaintiff's records without speaking with any of plaintiff's physicians, and instead of defendant's

8    conducting an independent medical exam of plaintiff (Pl.'s Mem. at 15), ignores the totality of

9    the circumstances standard.  As is set forth in a case relied on by plaintiff, California law does

10   not require the insurer to have its own doctors examine the insured; rather, as previously stated,

11   "'[a]n insurer's good or bad faith must be evaluated in light of the totality of the circumstances

12   surrounding its actions. [] In some cases, review of the insured's medical records might reveal an

13   indisputably reasonable basis to deny the claim without further investigation.'"  *Bosetti*, 175 Cal.

14   App. 4th at 1240 n.27 (finding insurer's failure to have insured examined by its own doctors was

15   not unreasonable as a matter of law quoting *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th at 723.

16   In *Callahan v. Northwestern Mutual Life Insurance Company*, 2010 U.S. Dist. LEXIS 17232, at

17   *20 (N.D. Cal. Feb. 26, 2010), the Northern District found "[a]n insurance company is not

18   always obligated to engage in an independent medical examination before denying benefits," and

19   found the plaintiff's contention that the denial of benefits was unreasonable because the

20   insurance company did not conduct an independent medical examination was not compelling.

21   Here, as in *Callahan*, as is clear from the extensive review performed by defendant and

22   discussed above in Section I, "there is no factual dispute regarding how [the insurance company]

23   handled [plaintiff's] claim and made its determination that [plaintiff] was not entitled to

24   _____

25         [7] This sixth contention also will not be considered further except to state that it is clear from the letter in which defendant informed plaintiff of its decision to cancel benefits that plaintiff's condition in its entirety was considered in reaching said decision.  (Nickelson Decl.,
26   Ex. 37, ECF 23-48.)

1  benefits." *Id*.  In both cases, the insurance company sought medical records and medical

2  opinions in making this determination and "no reasonable jury could find that there was no

3  genuine dispute over [plaintiff's] entitlement to disability benefits."  *Id*. at 21.

4          In ultimately denying plaintiff benefits, as discussed above, defendant relied on a

5  variety of findings.  *See* pages 2-5 *supra*; *see also* Nickelson Decl., Ex. 37, ECF 23-48.  On May

6  6, 2009, as previously stated, Dr. Schaefer, the orthopedic surgeon plaintiff originally contacted

7  when she tore her rotator cuff, indicated in response to questions from defendant that plaintiff

8  could return to work restricted to "no overhead work or lifting more than 10 pounds."

9  (Nickelson Decl., Exs. 31 & 32, ECF 23-42 & 23-43; ECF 25-1 ¶ 35.)  On July 6, 2009, in

10 contrast, Dr. Agresti, plaintiff's family doctor, indicated that plaintiff was completely disabled

11 and "unable to perform any work."  (Nickelson Decl., Ex. 35, ECF 23-46.)  At the motion

12 hearing, defendant informed the court that at the time of the denial, Drs. Agresti and Schaefer

13 were plaintiff's treating doctors.  In addition, defendant contends it was reasonable to assume Dr.

14 Schaefer knew about plaintiff's other conditions.  Plaintiff responded that Dr. Schaefer did not

15 know about any of plaintiff's conditions other than the shoulder problems he treated.  However,

16 as the doctor treating plaintiff's neck was Dr. Picetti, an orthopedic surgeon, it is reasonable that

17 in the face of conflicting opinions, defendant would place greater weight on the opinion of

18 another orthopedic surgeon, especially as it was supported by defendant's own consultant, Dr.

19 Waldram.  (*See* Nickelson Decl., Ex. 37.)  Moreover, in ultimately reaching its decision,

20 defendant considered all the evidence it had collected, including records from plaintiff's doctors,

21 conversations with plaintiff, and the opinions of Dr. Waldram and vocational consultants.  (*Id*.)

22 In this way, the situation here is unlike that in *Amadeo v. Principal Mutual Life Insurance*

23 *Company*, in which the Ninth Circuit found that plaintiff had "presented sufficient evidence from

24 which a jury could conclude that [defendant insurer's] denial of benefits to [plaintiff] was based

25 on a bad faith interpretation of its policy and an inadequate investigation into the basis of

26 [plaintiff's] claim."  290 F.3d 1152, 1156 (9th Cir. 2002).  In *Amadeo*, the plaintiff presented

1   evidence from which a jury could conclude that the defendant insurance company's

2   interpretation of its policy was pretextual and arbitrary where it did not conduct an adequate

3   investigation and ignored contrary evidence.  *See id.* at 1163-64.  Besides conclusory allegations,

4   plaintiff presents no evidence in this case that defendant's interpretation of the policy was

5   pretextual or that defendant ignored any relevant evidence.  (*See* Pl.'s Opp'n at 13-14 (plaintiff

6   sets out the standard for making such a finding but does not cite to any evidence that defendant

7   engaged in such conduct).)

8          Moreover, insofar as plaintiff disagrees with defendant's analysis of her job

9   duties, the court notes that, as previously stated, plaintiff listed herself as a "manager" on her

10  claim form and listed her job duties as "at computer, typing notes from meetings, doing reports

11  . . . business meetings, making critical business decisions . . . telephone conversations . . .

12  administrative staff, coach mentor."  (Nickelson Decl., Ex. 3.)  Plaintiff also admits elsewhere

13  that she was "primarily a sedentary 'desk worker.'"  (Pl.'s Opp'n at 4.)  Thus, her claims that

14  defendant was not reasonable or thorough in determining that her regular occupation was that of

15  "Manager, Office" are unavailing.  Even if "[t]he job also required Plaintiff to walk, bend, stoop,

16  climb and haul equipment . . ." (*id.*), such activities were, by plaintiff's own admissions, not

17  substantial and, in accordance with California law, an individual who is able to perform activities

18  constituting a "substantial portion" of his or her duties is not "totally disabled."  *See Erreca v.*

19  *Western States Life Ins. Co.*, 19 Cal. 2d 388, 398 (1942) (citing *Dietlin v. Missouri State Life Ins.*

20  *Co.*, 4 Cal. 2d 336 (1935)).

21          Likewise, plaintiff provides no support for her reliance on a purported "industry

22  standard" with which defendant allegedly had to comply; it is unclear what this alleged "industry

23  standard" is and why plaintiff references it.  (Pl.'s Opp'n at 10.)  At the motion hearing,

24  plaintiff's counsel indicated his reliance on an industry standard is supported by his expert and

25  the Ninth Circuit's decision in *Hangarter v. Provident Life & Accident Insurance Company*, 373

26  F.3d 998 (9th Cir. 2004).  In *Hangarter*, the Ninth Circuit only referred to industry standards

1    when citing a witness's testimony.  *See Hangarter*, 373 F.3d at 1010 & 1011 n.7.  It did not

2    discuss the meaning of "industry standard" in this context, nor did it rely on the breach of an

3    "industry standard" in reaching its decision; rather, the court clearly relied on a totality of the

4    circumstances analysis.  *See id.* at 1011 ("Viewing the evidence in Hangarter's favor, we

5    conclude that the district court did not err in determining that the jury had substantial evidence

6    before it to find that the Defendants engaged in a biased, and thus 'bad faith,' investigation.").

7    Ultimately, plaintiff conceded at hearing that the "industry standard" is part of the totality of the

8    circumstances, but still presented no evidence regarding what the industry standard is.  Similarly,

9    plaintiff provides no support for her contention that defendant acted in bad faith because its

10               denial letter includes a vague and generic job which
                 Standard feels Plaintiff could be employed as even though
11               the company has no proof that such jobs: a) specifically
                 and actually exist; b) are available to those who have
12               disability symptoms; c) have an employer who would
                 actually accommodate a disabled person who needs pain
13               medication; d) would hire someone who would need
                 routine breaks and regular rests lying down; e) would hire
14               someone with the physical limitations and restrictions
                 Plaintiff actually experiences and [sic] f) would tolerate an
15               employee such as Plaintiff who might have to call in
                 unpredictably having to miss work due to pain and
16               weakness.

17   (*Id.* at 10-11.)  Rather, plaintiff fails to point to any evidence to show defendant acted

18   unreasonably by not addressing these issues because there in fact is no requirement that it do so.

19               Furthermore, plaintiff provides no support for her contention that defendant used

20   the wrong definition for total disability.  (Pl.'s Opp'n at 12.)  As previously stated, defendant

21   defines "total disability" as being "unable to perform the substantial and material duties of Your

22   Regular Occupation."  (Not. of Removal at 24.)   This comports with the definitions for "total

23   disability" provided by the cases plaintiff relies on.  (Pl.'s Opp'n at 12 (citing, *e.g.*, *Erreca v.*

24   *Western States Life Ins. Co.*, 19 Cal. 2d 388 (1942).)  Indeed, precedent is clear that a court must

25   not deviate from the policy's definition where the definition of "total disability" provided in the

26   policy is occupation- and employee-specific.  *See Hangarter*, 373 F.3d at 1006-07 ("California

13

1   courts have specifically upheld jury instructions in the occupational policy context that defined

2   'total disability' as the inability to perform the substantial and material duties of one's *own*

3   occupation.").  Moreover, the fact that another insurer – Metropolitan Life Insurance Company

4   ("MetLife") – and the Social Security Administration are currently paying plaintiff disability

5   benefits (*id*. at 13) is irrelevant.  Defendant was not required to reach a different conclusion

6   based upon the decisions reached by these bodies, nor does plaintiff provide any support for such

7   a contention.  At hearing, plaintiff admitted that these determinations were not binding on

8   defendant.  In any event, plaintiff did not include either the MetLife policy or its determination

9   in the record and they are therefore inadmissible as evidence; neither the letter referred to by

10   counsel at the hearing submitted by plaintiff's husband nor the deposition (which also is not part

11   of the record) render this evidence admissible.

12           In addition, plaintiff's contention that defendant's "investigation was tailored to

13   deny plaintiff's claim for disability benefits" (Pl.'s Opp'n at 13)  is conclusory and unsupported

14   by the facts in the record.  Likewise, contrary to plaintiff's assertion (*id*. at 14), the

15   circumstances of plaintiff's denial are distinguishable from those of *Wilson v. 21st Century*

16   *Insurance Company*, in which the court found summary judgment inappropriate where the

17   insurer could not cite to any medical report or opinion to support its conclusion.  *Wilson*, 42 Cal.

18   4th at 721-22.  Here, plaintiff received insurance payments from defendant for more than two

19   years, during which time defendant conducted a thorough investigation that included contact

20   with plaintiff herself and plaintiff's physicians, consultations with a physician consultant, Dr.

21   Waldram, and referrals to vocational consultants.  *See* note 2 *supra* and accompanying text; *see*

22   *also, e.g.*, Nickelson Decl., Exs. 7, 24, 30, 33, 34.  A jury could not conclude that defendant

23   acted unreasonably.  *See Amadeo*, 290 F.3d at 1162.

24           Thus, plaintiff fails to state a claim for breach of the duty of good faith and fair

25   dealing.  Defendant did not act in bad faith.  Rather, the evidence shows that defendant

26   performed an extensive investigation and acted reasonably.  *Bosetti*, 175 Cal. App. 4th at 1236

1  (reasonableness and good faith require the insurer to "fully investigat[e] the grounds for its

2  denial" (internal quotation omitted)).  Plaintiff's contentions are conclusory and wholly

3  unsupported by the record, which instead shows that defendant's investigation was "full, fair and

4  thorough." *Id*. at 1237.  As in *Bosetti*, "[t]here is nothing in this record to suggest that

5  [defendant's] investigation into [plaintiff's] claim was in any way biased, inadequate, superficial

6  or otherwise unworthy of reliance by an objectively reasonable insurer." *Id*. at 1240.  As a

7  result, because plaintiff's only remaining claim is for breach of contract, plaintiff's punitive

8  damages claim fails as a matter of law.  *See Casey*, 688 F. Supp. 2d at 1102 ("'Under California

9  law, punitive damages are not available for breaches of contract no matter how gross or

10  willful.'" (quoting *Tibbs v. Great Am. Ins. Co.*, 755 F.2d 1370, 1375 (9th Cir. 1985))).

11  IV.  CONCLUSION

12          For the foregoing reasons, defendant's motion for summary judgment of

13  plaintiff's claims for breach of the duty of good faith and fair dealing and plaintiff's request for

14  punitive damages is hereby GRANTED.

15          IT IS SO ORDERED.

16  DATED:  September 5, 2011.

17

18  _____

19  UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26